Commonwealth of Pa. *v.* McGurk et al.

Argued March 16, 1932. Before TREXLER, P. J., KELLER, GAWTHROP, CUNNINGHAM, BALDRIGE, STADTFELD and PARKER, JJ.

*John A. Hober,* and with him *John E. Brenneman* and *Horace G. Ports* for appellant.

*Samuel S. Laucks,* Assistant District Attorney and with him *Ralph F. Fisher,* District Attorney, for appellee.

OPINION BY GAWTHROP, J., July 14, 1932:

Robert E. McGurk, George McKinley and George A. Storms bring these three appeals from separate sentences imposed after they were convicted by a jury on a bill of indictment which charged them and John M. Emig and J. W. McCormick with wilfully and maliciously conspiring to extort the sum of $300 from one Rinehardt. Emig and McCormick entered pleas of nolo contendere and testified for the Commonwealth.

At the time of the alleged conspiracy McGurk was an alderman of the Tenth Ward of the City of York. McKinley was a constable of Lower Chanceford Township, York County. Storms was a constable of the City of York. Emig was a Justice of the Peace of West York Borough, which adjoins the City of York. McCormick had been a deputy sheriff. According to the testimony, some weeks prior to February 27, 1931, Storms notified McGurk that complaints had been made to him that Rinehardt had whiskey in his house and suggested that he issue a search warrant and have

the house raided. McGurk refused to issue the search warrant because he intended to be a candidate for public office and did not want to make any enemies. Storms did not want to make an information because he was a neighbor of Rinehardt. A week or two later Storms and McCormick appeared at McGurk's office and discussed with him a proposed raid on Rinehardt's place. The result was that McGurk called Emig on the telephone, asked if he "would take a liquor case," and told him that he (McGurk) did not want to entertain the case and that Storms did not desire to be connected with it. Whereupon, on February 27, 1931, McGurk, McCormick and Storms went to Emig's office and met McKinley, who made an information before Emig, charging Rinehardt with illegal possession of liquor. A warrant to search Rinehardt's residence was issued to McKinley. Armed with this warrant McKinley, accompanied by McCormick, made a search of the Rinehardt house and found a quantity of whiskey and wine, which they took into their possession. They delivered a quart bottle of the whiskey to Alderman Emig, and destroyed the remainder. About a half hour later Amos W. Herrmann, attorney for Rinehardt arrived at Emig's office and asked him whether the case against Rinehardt could be adjusted. At that time, according to the testimony of Herrmann, McKinley was in one room and Emig and Herrmann were in an adjoining room. Emig said to Herrmann that it would be necessary to wait until McCormick came. They waited about ten minutes and McCormick came in. The door between the two rooms was closed. The witness continued: "Squire Emig and Mr. McCormick had a conference for about a minute or two. Mr. McCormick and Emig came and sat on the same settee on which I was seated. Emig, I think, in answer to my question whether the case could be adjusted, said, 'Yes,' and I said, 'How much?' Now, the one or the

other, either Emig or McCormick, said, 'Seven fifty.' I said, 'You mean seven dollars and a half?' and I think Mr. McCormick said, 'Seven hundred and fifty,' and Mr. Emig spoke up and said, 'There are five of us in this.'" Herrmann replied that he would have to see his client and left the office. He testified further that nothing was said by him in the presence of Mc-Kinley and that he thought it was impossible for Mc-Kinley to hear what was said. Emig testified that as soon as Herrmann left the office he (Emig) asked Mc-Kinley and McCormick "what they wanted to do and neither one would give me any satisfaction if they wanted to straighten it out or not." There was evidence that a day or two later Rinehardt, McCormick and Emig met in Emig's office and Rinehardt "agreed to pay to Mr. Emig, Mr. McCormick and three other gentlemen the sum of $300." A few days later Herrmann paid $300 to Emig. Emig testified further that he kept sixty-six dollars and some odd cents, gave Mc-Cormick sixty-six dollars and some odd cents, and put the balance of one hundred and sixty-six dollars and some odd cents in an envelope and gave it to McCor-mick for delivery to McGurk, who was to divide it between himself and Storms and McKinley. McCormick delivered the envelope containing this money to Mc-Gurk at his office about March 4, 1931, and told him that it was a present for him and McKinley and Storms. The envelope was sealed. Storms and Mc-Kinley appeared at McGurk's office the same evening. McGurk testified that he "picked up the envelope and told them this was sent in here with McCormick by Mr. Emig as a donation for us fellows and I said, 'As far as I am concerned I had nothing to do with the case and I don't want it,' and I pulled the drawer open and said it would stay there until McCormick came back ...... We all said we wouldn't accept a cent of it and threw it back in the drawer and it stayed there."

It is undisputed that McGurk kept the envelope for nineteen days and until the district attorney started an investigation of the transaction, which resulted in the return of the envelope and its contents to McCormick and in the return of the $300 to Rinehardt.

The principal contention made in behalf of each of the appellants is that the evidence was insufficient to sustain a finding by the jury that he was a party to the conspiracy charged in the indictment, to wit, a conspiracy to extort the $300 from Rinehardt. After examining the testimony with great care and in the light of the arguments presented by the able counsel for appellants, we are persuaded that the question of guilt or innocence of each defendant was for the jury. That there was a conspiracy to which Emig and McCormick were parties no one denies. As bearing on the question whether appellants, or any of them, were parties to this conspiracy, it seems to us that the actions of McGurk and Storms were unusual and peculiar from the beginning. Although McGurk desired, for personal reasons, to avoid entertaining the prosecution against Rinehardt, and Storms, for a similar reason, desired to avoid making an information against him, both of these defendants, according to McGurk's testimony, went with McCormick to Emig's office after McGurk had made arrangements with Emig over the telephone to entertain the proceeding. The evidence warrants a finding that McKinley learned from Emig immediately after the raid that Herrmann had offered to "straighten out" the case by the payment of money, and that when he was apprised of that fact he made no objection to such a disposition of the case. It is undisputed that McKinley and Storms appeared at the office of McGurk on the same evening that McCormick delivered to McGurk the envelope containing the money which Emig evidently regarded as the share of McGurk, McKinley and Storms in the spoils. All of the

appellants admit that when they learned that the envelope contained "a donation" to them from Emig for the Rinehardt case they kept quiet about the matter, and that none of them called the attention of the district attorney to the case. All of them were public officers. McKinley and Storms were constables and McGurk was an alderman. In all the circumstances we regard the evidence sufficient to warrant the jury in drawing the inference that all of appellants were parties to the conspiracy in which Emig and McCormick seem to have played the principal parts. It is well settled that a conspiracy may be proved by acts and circumstances sufficient to warrant an inference that the unlawful combination had been in point of fact formed for the fraudulent purposes charged: Ballantine v. Cummings, 220 Pa. 621. The Commonwealth need not prove an express confederation. This is generally impracticable.

The only other assignment of error necessary to be considered is that complaining of the refusal of the trial judge to affirm a point for a request for charge, that "if the jury find that the defendants merely passively acquiesced their verdict must be not guilty." This question was not raised on the motion for a new trial. No exceptions were taken to the general charge or to the answer to defendants' point, nor did counsel for defendants avail themselves of the opportunity afforded by the court to make objections or comments. Therefore we disregard the assignment. We may add, however, that a reading of the charge has convinced us that it adequately presented to the jury the question for their determination under the indictment, and that no reversible error was committed in the submission of the case. Appellants had a fair trial and we find no cause for disturbing the judgments.

In each appeal the judgment is affirmed and the record remitted to the court below, and it is ordered that

the defendant appear in the court below at such time as he may be there called and that he be by that court committed until he has complied with the sentence or any part of it which had not been performed at the time the appeal in this case was made a supersedeas.