Commonwealth *v.* Molinari, Appellant.

428

Argued April 1, 1955. Before RHODES, P. J., ROSS, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ. (HIRT, J., absent).

*Lemuel B. Schofield,* for appellant.

*Samuel Dash,* First Assistant District Attorney, with him *Victor Wright,* Assistant District Attorney, *Howard L. Criden,* Assistant District Attorney and *Richardson Dilworth,* District Attorney, for appellee.

OPINION BY GUNTHER, J., July 21, 1955:

The defendant, a magistrate in the City of Philadelphia, was indicted, tried and convicted of subornation of perjury. The evidence on behalf of the Commonwealth disclosed the following situation. On December 20, 1952, Anderson Sayles was arrested on a lottery charge, as was Benjamin DeStefano shortly thereafter upon Sayles' identification of him as the person to whom he turned in numbers slips. Sayles later signed and swore to a writing identifying DeStefano. The following day at his hearing Sayles denied knowledge of DeStefano and stated that he turned his slips in to a colored man. He repeated this story when he

pleaded guilty to the lottery charge in Quarter Sessions Court. In this trial he testified that he had lied when he denied knowing and working with DeStefano and that he changed his story at the instance of defendant. At the time of Sayles' first hearing on December 21, 1952, he was introduced to defendant by DeStefano just outside the hearing magistrate's office. The three men, together with Clarence Arthur who had been arrested with Sayles, went into a room in the office of a bondsman. In that room, immediately prior to Sayles' hearing, the defendant allegedly told Sayles to deny knowing DeStefano, that he turned numbers slips over to a colored man, and that the gang would pay all his expenses. The defendant sat on the bench with the hearing magistrate at Sayles' hearing. Sayles continued to deny any connection with DeStefano until he was indicted for perjury. He testified that De-Stefano later paid his fine and gave him a retainer for a lawyer.

The defendant denied the charges. He explained his presence at Sayles' hearing by stating that he was then a new magistrate, needed experience, and had been invited to that particular court on that day to learn procedures. He admitted conversing with Sayles in the bondsman's office, but contended that he merely recommended bail procedures. DeStefano refused to testify as to the conversation. Arthur testified that although he was in the same room he failed to hear the conversation.

Numerous allegations of error are made by defendant. Some of them, such as the admissibility of certain evidence and the proof of perjury under oath, are without merit and need not be detailed here in view of our decision. However there are several allegations of error in respect to prejudicial remarks and questions by the district attorney which have merit. This

trial engendered considerable public interest and heat and was fraught with political connotations. The result was a series of charges and counter charges and personal recriminations throughout the course of the trial. While cross examining one of the defendant's witnesses, the district attorney asked the witness if he didn't know a certain Bruno, reputed head of a criminal gang and an intimate friend of the defendant. There had been no testimony concerning this person theretofore. A similar question was asked of a character witness for defendant in respect to an alleged killer. Objection was sustained but the implication of the question remained. Altercations frequently ensued between defense counsel and the district attorney. In one of these the latter referred to the fact that the former had once been locked in jail while a public official and had been reprimanded as an attorney by the Supreme Court of Pennsylvania. At another point the district attorney expressed the hope that a Commonwealth witness would slap defense counsel between the eyes. The record is replete with similar improper statements and remarks and there is no need to repeat each one in detail.

In addition the district attorney in his summation to the jury engaged in a highly emotional and improper appeal the gist of which was that defendant was a corrupt politician in alliance with the underworld and that the district attorney and his staff were risking their lives and futures in an effort to clean up the situation. The summation included a clear appeal to passion and fear by statements that there had been threats of reprisal. A great deal of this was unsupported by any evidence whatsoever.

The Commonwealth argues that the obviously improper remarks by the district attorney throughout the trial were provoked by defense counsel. There is much

truth in that argument and the record discloses many equally improper remarks by him. There is also some merit to the argument that the district attorney's political remarks, as in his summation, were warranted because defense counsel had clearly stated that the entire case was motivated by the district attorney's political ambitions. However, the retaliation was excessive in the extreme. Many of the district attorney's remarks did not directly follow provocative conduct by defense counsel but occurred after considerable intervals. A reading of the record clearly reveals that the entire trial was characterized by extreme bitterness between counsel and violent, emotional and abusive conduct. The whole atmosphere was one of highly charged emotion, passionate and personalized attacks and appeals to fear. A fair trial under the evidence does not ensue in such a situation. The conduct of both counsel went beyond the bounds of propriety.

In order to justify a reversal, the language of the prosecuting officer must have been such that its unavoidable effect was to prejudice the jury and to inflame them with passion and bias so that they could not fairly reach a true verdict under the law and the evidence. *Commonwealth v. Meyers*, 290 Pa. 573, 139 A. 374; *Commonwealth v. Balles*, 160 Pa. Superior Ct. 148, 50 A. 2d 729. Although each individual remark or statement made by the district attorney would perhaps not cause a reversal standing alone, particularly those in retaliation to defense counsel, the entire weight of all the objectionable and improper remarks could only have had the effect of inflaming and prejudicing the jury. It is true that the trial judge in his charge warned the jury not to heed the objectionable phases of the trial and to render a verdict based solely upon the law and the evidence. Improper remarks can generally be cured by the instructions to the jury, unless

the remarks and statements are too flagrant. *Commonwealth v. Wilcox,* 316 Pa. 129, 173 A. 653. We are of the opinion that the nature, frequency and weight of all the objectionable remarks in this trial were so flagrant and improper as to render the charge inadequate to correct their cumulative effect. We are mindful that a long and expensive trial should not be repeated because of a few remarks by an overzealous prosecutor, especially where defense counsel's conduct is also unbecoming and provocative. However, the defendant is entitled to a trial free of personal bitterness, continuous contumely, passion, fear and prejudice. These elements were unfortunately present in abundance and a new trial should be awarded to afford a more rational atmosphere for the determination of guilt or innocence.

Judgment of sentence reversed and a new trial awarded.

----

DISSENTING OPINION BY RHODES, P. J.:

The majority opinion is an ominous decision because, without fairly meeting the issues, it countenances trial tactics by the defense which sought to confuse and attempted to create an atmosphere conducive to a new trial in the face of certain conviction. The decision is in marked contrast to appellate review in *United States v. Dennis,* 183 F. 2d 201, and *Dennis v. United States,* 341, U. S. 494, 71 S. Ct. 857, 95 L. Ed. 1137.

Certainly neither conditions deliberately created by the defense nor mere technicalities should be the basis for setting aside a proper and just conviction of this public official.

On this appeal astute defense counsel has not questioned the sufficiency of the evidence to justify the verdict of guilty. A brief of 103 pages is devoted to

criticism of the district attorney and the trial judge, which the majority opinion, with little more than a generalization, has accepted. As we view it, the actual complaint in defendant's brief seems to be that the district attorney proved the equal of defense counsel and capable of coping with his provocative conduct which extended from the beginning to the end of the trial. The court below in its opinion clearly stated what the majority ignores: "The defense brought upon itself the things of which it complains in this regard." It is worthy of note that the trial judge displayed unlimited patience and judicial restraint, and it may be said of him as it was of Judge MEDINA, in the opinion of the Court of Appeals (Cir. 2) in *United States v. Dennis*, 183 F. 2d 201, 226, that he "showed considerably greater self-control and forbearance than it is given to most judges to possess."

It is necessary to give a more adequate review of the evidence which clearly demonstrates the justification of defendant's conviction and sentence. The majority opinion makes no reference to this fact.

The Commonwealth established that on December 20, 1952, two plain-clothes policemen arrested a colored Philadelphia Transportation Company porter named Clarence Arthur in the Spring Garden Station of the Broad Street Subway. Arthur had numbers slips in his possession. Shortly thereafter another P. T. C. porter, Anderson Sayles, appeared and was taken into custody by the officers who found numbers slips in his possession. Anderson Sayles, the Commonwealth's chief witness, told the officers he had been turning in his numbers to Benjamin DeStefano, known as Skinny Benny. Shortly thereafter DeStefano appeared, nodded to Sayles and Arthur, and was arrested by the officers. Later that day Sayles signed and swore to a written statement in which he identified DeStefano as the

Skinny Benny to whom he turned in his number plays. Arthur, Sayles, and DeStefano were held for court but later that night all three were released on copies of the charge, the copies relating to Sayles and DeStefano being signed by Magistrate Molinari, the defendant. The next day, December 21, 1952, on the way to the preliminary hearings at the 12th and Pine Street divisional police court, Sayles was hailed by Skinny Benny who introduced him to defendant outside the premises at 1206 Pine Street occupied by a bondsman named Biener. Arthur was also present. Defendant led Sayles, Arthur, and Skinny Benny into a small room in bondsman Biener's office. Defendant then told Sayles to change his story and testify at the coming hearing that Sayles did not know Skinny Benny but turned his numbers over to a man named Shorty. In the words of Sayles, defendant stated to Sayles: "You won't have nothing to worry about. I'll see that the gang takes care of you, it won't cost you nothing. They'll pay for everything." Defendant then left Biener's office, walked with Magistrate Segal to the police station at 12th and Pine Streets, where defendant sat with Segal on the bench during the hearings, including the hearings of Arthur, Sayles, and Skinny Benny. Sayles testified under oath that he did not know Skinny Benny.

Of the three witnesses to the alleged subornation in Biener's little room, Skinny Benny, called to the stand, claimed privilege against self-incrimination and was excused. Arthur admitted being in the small room but stated he did not hear what the others, who were in a circle, said. Defendant knew Arthur as a close friend for thirty years and admitted obtaining counsel for Arthur. Magistrate Segal held Sayles and Arthur under bail for court on a charge of lottery; Skinny Benny was discharged. Defendant appeared at the trial of Sayles and Arthur before Judge Saylor, in the Court of

Quarter Sessions, on July 27, 1953, and asked Attorney Gus Wilderman to represent Sayles as well as Arthur. Defendant was present in the courtroom during this lottery trial. Sayles pleaded guilty but persisted in his statement that he did not know Skinny Benny. On July 31, 1953, Sayles was fined $150 and costs by Judge Saylor. Sayles paid the fine, left the courtroom and met defendant in the corridor. Defendant told Sayles he knew Skinny Benny's brother and would see that Sayles received his money. Skinny Benny came to Sayles' house that evening and told Sayles he would reimburse Sayles the $200 fee paid Wilderman. Later Skinny Benny paid Sayles $200, plus $50 toward a retainer fee for Wilderman on a perjury charge.

The defense was a denial. Defendant testified he sat on the bench with Magistrate Segal on December 21, 1952, as a recently appointed magistrate, to learn the duties of the office. The Commonwealth showed that, as a committeeman and political figure of long standing, defendant must have been thoroughly familiar with the duties and functioning of a magistrate's court. The Commonwealth developed other possible inconsistencies in defendant's testimony, which bore directly on his credibility and that of his witnesses. For instance, Sayles testified that Attorney Wilderman represented him before Judge Saylor at the request of defendant, whereas Wilderman testified defendant had nothing to do with Wilderman's representation of Sayles. Thus, in spite of numerous character witnesses, including judges and prominent political figures, it is not surprising that the jury found defendant guilty.

I recognize that this was a vigorously contested trial involving prominent public figures and wide public interest. Counsel for defendant and the district attorney often exchanged heated remarks. During the trial the trial judge said to counsel: "I can't pass on the

relative offensiveness of what you call each other, so it's better if neither called each other anything." Though often irrelevant, these remarks, in the opinion of the trial judge who heard the case, were not prejudicial or such as to deprive defendant of a fair trial. These exchanges, though at times vehement, did not interfere with the jury's ability to arrive at a just verdict based on ample evidence of guilt. The trial judge in his charge adequately cautioned the jury that they should consider only the evidence in the case and disregard remarks of counsel which were not supported by evidence. In his charge he said: "You should consider the case on the evidence and that alone. Any statements of fact made by counsel not based on the evidence, have no place in your deliberations at all. Any statements of fact made by counsel in their speeches, or during the exchanges between them in these three or four days, based upon something other than evidence given from the witness stand, shouldn't be considered by you at all in coming to your conclusion." Remarks of a prosecuting officer or counsel which will vitiate a criminal proceeding where the verdict is a just one based on evidence must be such as unavoidably prejudice the jury and interfere with their ability to render a true verdict. *Com. v. Meyers,* 290 Pa. 573, 581, 139 A. 374; *Com. v. Westwood,* 324 Pa. 289, 188 A. 304. As the Supreme Court, affirming on Judge KELLER'S opinion, stated in *Com. v. Wilcox,* 316 Pa. 129, 143, 144, 173 A. 653, 659: "After all, whether or not the judgment will be reversed because of the remarks of the district attorney depends not only on the remarks themselves but also on the attitude of the court following objection and the probable effect as reflected in the verdict of the jury." Further, a defendant cannot object to remarks made by a prosecutor which defense counsel invited. As Judge HIRT stated in *Com. v.*

*Grosso,* 169 Pa. Superior Ct. 606, 611, 84 A. 2d 239, 241: "The remark objected to was invited by an improper argument by defense counsel and appellant therefore may not complain, especially in the light of the court's admonition to both counsel to confine their arguments to the evidence in the case. The refusal to withdraw a juror in situations such as this is largely a matter of discretion with the trial judge, to be disturbed only in case of abuse and a reversal will not ordinarily be granted where the statement was apparently in reply, as here, to an improper argument of counsel for defendant." In the present case, the remarks of the district attorney, now objected to by defense counsel, were often the result of deliberate design by defense counsel. The trial judge frequently reminded defense counsel of his conduct and offensive remarks. The trial judge in his opinion refusing a new trial well said: "The Commonwealth is entitled to a fair trial, as well as the defendant, a fact sometimes lost sight of these days. If counsel for the defense deliberately sets out to provoke the district attorney and brings on heavy retaliation, is his client, clearly guilty under the evidence, to receive a new trial because of this? . . . It is one of the glories of our current jurisprudence in America that a new body of law is being built up interpreting and fleshing out the constitutional rights of defendants in criminal cases. But we should be equally careful, where no question of real unfairness to a defendant is involved, not to deprive the community of its right to be treated fairly. This is particularly true when the conduct alleged for granting the new trial is provoked by defendant or his counsel."

Defense counsel, by questions asked from the beginning of the trial and in his opening argument to the jury, raised the issue that the prosecution was personally brought by the district attorney for political

reasons and not in the regular course of proceedings in his office. The charge was made that the district attorney waited until a few days before the November election to bring the prosecution for the purpose of embarrassing defendant. It was therefore fully competent and proper for the two assistant district attorneys, in order to rebut the charge that the prosecution was politically motivated and inspired, to testify that when Sayles was arrested for perjury, the district attorney's office had no idea that defendant was involved. In the circumstances, the district attorney was not required to allow the statements of defense counsel to go unchallenged.

It is a fundamental fact that the incidents or remarks now relied upon as reasons for a new trial were the result of deliberate action of counsel for defendant. It is impossible to escape the conclusion from the record that defendant's counsel attempted throughout to try the case on the issue of the district attorney's alleged political motivation and timing in bringing the prosecution rather than the issue of defendant's guilt or innocence. Within the bounds of propriety defense counsel may try a case in any way he sees fit, but he cannot obtain a new trial for his client on the basis of alleged errors and incidents that counsel deliberately created.

I think I should point out that the district attorney's cross-examination of defendant was proper. Defendant had testified he sat with Magistrate Segal the morning of Sayles' hearing on the lottery charge, as a newly appointed magistrate, in order to become acquainted with the duties of the office. Questions asked defendant on cross-examination tended to show that, as a successful committeeman for many years, defendant was fully acquainted with a magistrate's court and the procedures; hence he did not need to sit with Magistrate

Segal for this purpose. In this connection it was shown that defendant's wife acted as secretary or clerk to a magistrate for some time. The Commonwealth could properly contend that defendant came to Magistrate Segal's court to complete his efforts in suborn Sayles to commit perjury.

There was no reversible error in the cross-examination of defendant's witness Wilderman, to which passing reference is made in the majority opinion, as to his representation of Arthur and Sayles at the lottery trial before Judge Saylor in July, 1953. Sayles' testimony that Wilderman agreed to represent him at the instance of defendant was inconsistent with Wilderman's testimony that defendant had nothing to do with Wilderman's representation of Sayles. It was relevant for the Commonwealth to show that defendant had induced Sayles to testify falsely before Magistrate Segal, and that he had followed later judicial proceedings against Sayles to see that Sayles persisted in his perjury. The extent of cross-examination is laregly a matter within the discretion of the trial judge. *Com. v. Craven,* 138 Pa. Superior Ct. 436, 445, 11 A. 2d 191. It was plainly relevant and proper for the district attorney, on cross-examination of Attorney Wilderman, to ask whether or not Wilderman had not, long before the present prosecution, related to the district attorney that defendant as a new magistrate was being taken advantage of by certain people, and whether or not Wilderman had specifically mentioned the "Bruno mob" of South Philadelphia in this connection. This reference was not objected to, nor was it prejudicial. Cf. *Com. v. Flori,* 300 Pa. 125, 150 A. 290; *Com. v. Kay,* 14 Pa. Superior Ct. 376. The majority considers this as a reason for reversal as the "implication of the question remained." Neither this nor the "extreme bitterness between counsel" can justify a reversal.

So, also, it was proper for the district attorney to ask character witness Magistrate Levin, on cross-examination, in connection with the witness' testimony that Levin knew many people who knew defendant, whether or not Levin knew "Danny Day." Defendant's objection to the district attorney's reply to the witness' question "Who is Danny Day?" was sustained, and no prejudice to defendant is established here.

In view of the fact that the majority opinion has reversed the conviction and sentence with a few generalities and one or two references to the cross-examination of witnesses, I have deemed it necessary to discuss the principal issues raised on this appeal. Wherein was reversible error committed by the trial judge? What should he have done that he did not do? If trial by jury is not to break down, conditions deliberately brought about by the conduct of defense counsel cannot be an acceptable excuse for granting a new trial. In many respects the majority opinion is unusual; and the fact that the case was capably and impartially tried by Judge FLOOD, notwithstanding the attempts of defense counsel to make impossible an orderly and speedy disposition of the case, seems to be forgotten in the haste to reach a conclusion on the record of 1057 pages.

The evidence of defendant's guilt was conclusive. The right of defendant to a fair and impartial trial was fully protected by the trial judge. No fundamental error was committed in the trial or in the refusal of a new trial. The evidence could lead only to the verdict that was reached.

I would affirm the judgment of sentence of the court below.

ROSS, J., joins in this dissent.